ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| CATERINA RACHELE<br><br>Apelada-Recurrida<br><br>V.<br><br>UNIVERSAL INSURANCE COMPANY; COMERCIAL LA PINO, INC.; M. OTERO & COMPAÑÍA, INC.<br><br>Apelantes-Peticionarios | KLAN202500093<br><br>Consolidado<br><br>KLCE202500315 | *APELACIÓN* procedente del Tribunal de Primera Instancia Sala de San Sebastián<br><br>Civil Núm.: SS2021CV00458<br><br>Sobre: Daños y Perjuicios (Accidente vehículo de motor) |

Panel integrado por su presidenta, la jueza Ortiz Flores, la juez Brignoni Mártir y el juez Candelaria Rosa

Brignoni Mártir, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de junio de 2025.

Comparecen ante nos, Universal Insurance Company ("Universal"); Comercial La Pino Inc ("Comercial La Pino"); y M. Otero & Compañía, Inc. ("M. Otero"), en adelante, en conjunto, "los apelantes-peticionarios"; por medio del recurso **KLAN202500093** y el recurso **KLCE202500315**, consolidados por este Tribunal a través de la "*Resolución*" emitida el 7 de abril de 2025.

En el caso **KLAN202500093**, los apelantes-peticionarios solicitan nuestra intervención para que dejemos sin efecto la "*Sentencia*" emitida y notificada el 9 de enero de 2025, por el Tribunal de Primera Instancia, Sala Superior de San Sebastián. Mediante el referido dictamen, el foro primario declaró "*Ha Lugar*" la "*Demanda*," presentada por Caterina Rachele (en lo sucesivo, "la apelada-recurrida"). En consecuencia, ordenó a los apelantes-peticionarios que indemnizaran a la apelada-recurrida por los daños físicos, mentales y económicos que sufrió; más les impuso el pago de honorarios de abogado por temeridad y el pago de costas, gastos e intereses legales.

De otra parte, mediante el caso **KLCE202500315**, los apelantes-peticionarios solicitan que revoquemos la "*Orden*" emitida el 4 de marzo de

2025 y notificada el 6 de marzo de 2025, por el Tribunal de Primera Instancia, Sala Superior de San Sebastián. Mediante esta, el tribunal de instancia declaró *Ha Lugar* el "*Memorándum de Costas*," presentado por la apelada-recurrida. En consecuencia, ordenó a los apelantes-peticionarios que pagaran a la apelada-recurrida la cantidad de $15,157.34 en concepto de costas de litigio.

Por los fundamentos que expondremos a continuación, *modificamos* la "*Sentencia*" dictaminada en el caso **KLAN202500093** a los *únicos efectos* de reducir la cuantía concedida en concepto de daños físicos, impedimento y angustias mentales a la cantidad resultante de **$400,000.00**. *Confirmamos* en todos sus extremos el resto de la referida "*Sentencia*." De otra parte, determinamos al amparo de la Regla 40, 4 LPRA Ap. XXII-B, *expedir* el recurso de *certiorari* **KLCE202500315**, y con ello *confirmamos* la "*Orden*" recurrida.

El 29 de septiembre de 2021, la apelada-recurrida presentó la "*Demanda*" de epígrafe. Relató, que el día 23 de abril de 2019, fue impactada por un camión perteneciente a Comercial La Pino mientras viajaba como pasajera en un vehículo de motor que estaba detenido ante un semáforo con luz roja. Según sostuvo, debido al aludido impacto sufrió traumas en la región lumbar, región cervical y en el hombro izquierdo. Ante ello, solicitó una indemnización por daños físicos; angustias mentales; lucro cesante; y daños especiales a ser satisfecha de manera solidaria por los apelantes-peticionarios.

En reacción, el 22 de diciembre de 2021, los apelantes-peticionarios presentaron "*Enmienda a Contestación a Demanda*." Reconocieron la ocurrencia de los hechos relatados en la "*Demanda*." No obstante, negaron las imputaciones de negligencia y sostuvieron que la apelada-recurrida contribuyó a la realización de los daños alegados.

Tras varios trámites procesales que no son necesarios de pormenorizar, el 4 de abril de 2023, las partes presentaron el "*Informe de

*Conferencia con Antelación al Juicio.*" A través de este, esbozaron las siguientes estipulaciones de hechos:

1. La demandante, Caterina Rachele, es mayor de edad, soltera y con dirección física en la Carretera 108 km. 21.3 Interior Bo. Río Arriba, Añasco y postal PO Box 16315 Añasco, PR 00610.

2. El accidente que motiva la demanda ocurrió el 23 de abril de 2019 alrededor de las 1:00pm en el kilometro 15.7 de la carretera PR-111 intersección con la carretera PR-125 de San Sebastián, Puerto Rico.

3. La PR-111 es una carretera de asfalto con carriles en ambas direcciones.

4. En la intersección de la carretera PR-111 con la carretera PR-125 existe un semáforo de control de tráfico.

5. El lugar donde ocurre el accidente es una recta llana área sin obstrucciones visuales. El día del accidente el pavimento estaba seco, era de día y el clima estaba claro.

6. El vehículo, una Jeep Patriot del 2014, tablilla IIE-357, transitaba de oeste a este por la PR-111, era conducido por el Sr. Pedro Martínez Sifre y se encontraba detenido en la intersección esperando el cambio de luz en el semáforo.

7. La demandante, Caterina Rachele, viajaba en el asiento pasajero frontal.

8. El camión, un Kenworth W900 del 1997, tablilla 3381R, transitaba de oeste a este por la PR-111 y era conducido por el Sr. Jesús Vera Rivera.

9. La demandante, Caterina Rachele, tenía 30 años de edad al momento del accidente.

10. La parte demandada aceptó la responsabilidad por el accidente que motiva el caso de autos. Véase Resolución del 7 de marzo de 2023, entrada 62 de SUMAC.

11. La Póliza de Seguros número 09-518-00578472 con vigencia del 08/09/2018 expedida por Universal Insurance Company a favor de M. Otero & Co. Inc. está sujeta a las cláusulas y condiciones y sujeta a los límites de $1,000,000.00 expuestos en la misma.

El juicio se celebró los días 23, 27, 30 y 31 de octubre de 2023 y 27 y 28 de febrero de 2024. La apelada-recurrida desfiló prueba testifical y pericial consistente en el testimonio del Dr. Héctor Cortés Santos; el señor Elías Fernández Pérez; el Dr. Javier Espina y la propia apelada recurrida, la señora Caterina Rachele. Por su parte, los apelantes-peticionarios presentaron prueba pericial consistente en el testimonio del Dr. Suárez Castro y el Dr. Jaime del Valle. A su vez, los apelantes-peticionarios presentaron como prueba de impugnación las declaraciones del detective privado, José A. Rodríguez Colón.

La apelada-recurrida testificó sobre sus circunstancias laborales y estilo de vida antes de la ocurrencia de los hechos que motivaron la "*Demanda*." De igual modo, testificó sobre los daños que sufrió a consecuencia del impacto vehicular antes reseñado. Particularizó, que debido al aludido impacto sintió un dolor fuerte en la espalda, cuello, pecho y sangrado en la nariz. Relató, que el día de los hechos fue traslada al Hospital en ambulancia y recibió el alta ese mismo día. En cuanto al tratamiento médico, expresó que recibió treinta y cuatro (34) terapias físicas; bloqueos lumbares; y le realizaron una operación lumbar. Mediante la referida operación le colocaron seis (6) tornillo, dos (2) varillas y dos (2) spacers. Luego de la operación estuvo tres (3) días hospitalizadas. Además, testificó que el accidente vehicular provocó que fuera diagnosticada con discos herniados. En la actualidad, según aseveró, puede ponerse en pie y vestirse sin asistencia, salvo para colocarse y quitarse los pantalones.[1]

El Dr. Héctor Cortés Santos fue calificado como perito médico en el área de fisiatría. Éste, evaluó a la apelada-recurrida y rindió el 26 de marzo de 2021 un informe pericial. Mediante dicho informe, concluyó que la apelada-recurrida tiene un diecisiete por ciento (17%) de impedimento físico permanente. Además, relató que la referida parte tiene un hallazgo de radiculopatía bilateral y que se le realizó una intervención quirúrgica, la cual consistió en una operación de dos (2) niveles: L4 a L5 a S1 con fusión bilateral. Especificó, que la aludida radiculopatía persiste de manera residual en la extremidad izquierda de la apelada-recurrida, lo que significa que ella tiene una disminución de sensación en el muslo izquierdo. Aseveró, que el diagnostico postoperatorio fue "Lumbar herniated disks." En cuanto al estilo de vida de la apelada-recurrida, declaró que se encuentra independiente para realizar actividades básicas del diario vivir y que necesita asistencia para afeitarse y colocarse pantalones.[2]

---

[1] Véase la Transcripción del *Juicio en su Fondo*, págs. 17-19; 22-23; 34-38; 43; y 98.
[2] Véase la Transcripción del *Juicio en su Fondo*, págs. 129; 133; 144; 155; 199; 223; y 245.

El señor Elías Fernández Pérez fue calificado como perito en contabilidad para evaluar los daños económicos de la apelada-recurrida. El referido perito presentó el 15 de febrero de 2022 un informe pericial, mediante el cual calculó la perdida de ingresos de la apelada-recurrida hasta la edad de sesenta y siete (67) años. Utilizó el ingreso base que generaba la apelada-recurrida en el puesto que ocupaba como chofer de guagua escolar, cuya suma era de $23,155.00. Tras aplicar una tasa de crecimiento anual de tres porciento (3%) y un descuento de (2.36%), según el rendimiento de los bonos de treinta (30) años del Tesoro Federal, el lucro cesante que sugirió para la apelada-recurrida resultó en la suma de $960,747.00.[3]

El Dr. Javier Espina fue calificado como perito en terapia física. El referido perito presentó un informe pericial en el año 2022. Mediante este, opinó sobre la capacidad funcional de la apelada-recurrida. Para llevar a cabo dicho informe utilizó cuestionarios estandarizados y examinó las pruebas médicas realizadas a la apelada-recurrida. Concluyó que la apelada-recurrida tiene una limitación funcional severa que le impide retomar su antiguo puesto laboral y realizar cualquier otro trabajo en la economía nacional de manera razonable y continua. Comunicó, que la referida parte tenía una clasificación menos que sedentaria al momento de ser evaluada. Expresó, que con dicha clasificación la apelada-recurrida puede cocinar; utilizar la computadora en su hogar; manejar a distancias cortas; y caminar por veredas naturales y ríos en terrenos no escabrosos ni resbaladizos durante periodos de poca duración.[4]

El Dr. Jaime Del Valle fue calificado como perito en economía. Rindió un informe pericial en el año 2022. El referido perito obtuvo el ingreso base de la apelada-recurrida al computar los ingresos que ésta había obtenido entre los años 2014-2018. Como resultado del referido cómputo obtuvo un ingreso promedio de $9,340.00, el cual utilizó como el ingreso base de la apelada-recurrida. Expresó, que proyectó dicho ingreso

---

[3] Véase la Transcripción del *Juicio en su Fondo*, págs. 276; 287-288; 293-294; y 297-298.
[4] Véase la Transcripción del *Juicio en su Fondo*, págs. 483; 490-492; 495-496; 564-568.

en consideración de la edad máxima en la que se recibe el beneficio del seguro social. Entiéndase, 67.65 años. A su vez, ajustó el ingreso futuro proyectado al ingreso probable que recibiría la apelada-recurrida a la luz de las tasas de vida, participación y empleo. El Dr. Jaime Del Valle realizó una segunda proyección de ingresos futuros para la apelada-recurrida. En este estimado, utilizó el ingreso base propuesto por el perito de la apelada-recurrida, es decir la cantidad de $23,155.00. Como paso posterior, utilizó la metodología que aplicó a su primer cómputo de daños económicos. Esto, resultó en un lucro cesante de $356,203.00, para el cual tomó en consideración el impedimento permanente de la apelada-recurrida.[5]

El testigo José A. Rodríguez Colón es un detective privado que fue contratado por los apelantes-peticionarios en fecha de 29 de septiembre de 2022 para investigar a la apelada recurrida. Declaró, que observó que la apelada-recurrida podía manejar un vehículo de motor, caminar normal y llevar a cabo actividades como sentarse en un banco a leer. Además, testificó que siguió el rastro de la apelada-recurrida durante unos cinco (5) o seis (6) días, y que quien la observó directamente fue un compañero de trabajo. Aseveró, que él solo se limitó a revisar el video de la apelada-recurrida tomado por su compañero.[6]

El Dr. José Suarez Castro fue calificado como perito en cirugía ortopédica. Examinó a la apelada-recurrida en fecha de 10 de marzo de 2022. Concluyó, que ésta tiene discos herniados entre las áreas de L4-L5 y S5-S1. En vista de ello, determinó que la apelada-recurrida tiene un diecisiete por ciento (17%) de impedimento físico. Concluyó, además, que dicha parte no tiene impedimento en el área cervical.[7]

Concluida la vista en su fondo, el 9 de enero de 2025, el tribunal de instancia notificó la "*Sentencia*" del recurso **KLAN202500093** que hoy nos ocupa. Mediante esta, declaró "*Ha Lugar*" la "*Demanda*" de epígrafe. En consecuencia, concedió a la apelada-recurrida las siguientes indemnizaciones:

---

[5] Véase la Transcripción del *Juicio en su Fondo*, págs. 371; 373; 406; 446; y 466.
[6] Véase la Transcripción del *Juicio en su Fondo*, págs. 260; y 265-270.
[7] Véase la Transcripción del *Juicio en su Fondo*, págs. 585; 587-588.

1). La cantidad de $523,972.60 por concepto de daños físicos, impedimento físico permanente y sus sufrimientos y angustias mentales.

2). La cantidad de $356,203.00 por concepto de lucro cesante.

3). La cantidad de $10,000.00 por concepto de honorarios de abogado.

4). El pago de costas, gastos e interés legal de 9.50% en favor de la apelada-recurrida.

Además, el foro primario esbozó en la *"Sentencia"* apelada las siguientes determinaciones de hechos:

1. La Sra. Caterina Rachele tiene 35 años de edad. Nació en Calabria, Italia. A los quince (15) años se mudó junto a su familia al Estado de New Jersey.

2. El grado académico más alto alcanzado por la Sra. Rachele fue escuela superior.

3. La Sra. Caterina Rachele declaró que luego de haberse graduado de escuela superior comenzó a trabajar en el 2008 como mesera en Café Dennise, luego en una repostería, luego trabajó en un supermercado en el área de la cocina que se llama Saker Shop Rite, y luego en Crate and Barrel en el área del almacén.

4. Durante los años 2016 y 2017, se mudó temporalmente a Puerto Rico, ya que se encontraba cuidando a un familiar de su entonces pareja, por lo cual durante esos años no trabajó.

5. Manifestó que luego del Huracán María, aproximadamente en enero de 2018, la demandante obtuvo la licencia para conducir guaguas escolares en el Estado de New Jersey y en el mes de marzo de 2018 comenzó a trabajar como chofer de guaguas escolares para el Departamento de Transportación del Toms River Regional Schools de New Jersey, inicialmente con un puesto de conductora sustituta.

6. Luego, el 18 octubre de 2018, a la demandante le fue concedida la plaza de manera permanente como chofer de guaguas escolares para el Departamento de Transportación del Toms River Regional Schools de New Jersey.

7. Como requisito para obtener su licencia para conducir guaguas escolares la demandante tuvo que pasar un examen físico, en el cual, revisaron sus expedientes médicos previos y tuvo que pasar unas pruebas de movimiento y peso entre las cuales tenía que utilizar un cubo de 50 libras de peso.

8. Como parte de sus funciones como chofer de guagua escolar la demandante tenía que levantar y sentar niños con necesidades especiales, levantar y acomodar sillas de ruedas, cargar y acomodar los bultos de los estudiantes que requerían asistencia, además de conducir la guagua escolar hacia los diferentes destinos de los estudiantes.

9. Al momento de comenzar su permanencia en octubre del 2018, el salario de la demandante era de $23,155.00 anuales.

10. El 23 de abril de 2019, la demandante se encontraba disfrutando de unas vacaciones en Puerto Rico. Ese día, en horas de la tarde, la demandante transitaba como pasajera por la carretera 111, jurisdicción de San Sebastián, utilizando el cinturón de seguridad en una Jeep Patriot. Mientras la demandante se

encontraba en el vehículo que estaba detenido esperando el cambio de luz del semáforo, el vehículo en que viajaba fue impactado fuertemente por la parte posterior por el camión propiedad de la parte demandada.

11. A consecuencia del impacto la demandante le dio con su rostro al "dash" del vehículo, en ese momento sintió que se le sacudió todo su cuerpo y comenzó a sentir un ardor como un "shock" eléctrico, con un dolor fuerte en su espalda, que le bajaba hasta el talón de su pie izquierdo. También sintió dolor en el cuello y en el pecho y además comenzó a sangrar por su nariz.

12. Al llegar la ambulancia al lugar de los hechos, la montaron en la camilla, le pusieron un collar cervical y la trasladaron a la Sala de Emergencias de Pepino Health Group. En la Sala de Emergencias le administraron medicamentos para el dolor y la inflamación y le tomaron radiografías del cuello, espalda baja, rostro y hombro izquierdo.

13. La demandante tuvo que permanecer en cama por los siguientes 4 días luego del accidente hasta que regresó a New Jersey el 28 de abril de 2019. Al llegar a New Jersey, la demandante notificó en su trabajo el accidente que había sufrido y visitó a su doctora. Su doctora de New Jersey le recetó medicamentos antiinflamatorios y relajantes musculares y la refirió a un Ortopeda.

14. En su cita con el Ortopeda en New Jersey, el doctor revisó las placas que le habían realizado en Puerto Rico y le ordenó tomar terapias físicas. Luego de tomar las terapias físicas el ortopeda la refirió a un neurólogo. El neurólogo le ordenó unos estudios de Imagen de Resonancia Magnética (MRI). Luego de evaluar los resultados de los estudios, el neurólogo le confirmó a la demandante que tenía varios discos herniados en su espalda baja.

15. En ese momento los profesionales médicos que la atendían en New Jersey le indicaron que podía volver a trabajar a partir del 20 de mayo de 2019, lo que la demandante hizo, trabajando hasta culminar el año escolar 2019.

16. La demandante no pudo desempeñarse como lo hacía antes del accidente y conforme le era requerido en su trabajo ya que presentaba dolores intensos en su espalda baja y sentía adormecimiento en su pierna izquierda.

17. Ante esta situación y debido al riesgo que implicaba manejar una guagua escolar de niños en esas condiciones, la demandante solicitó un acomodo razonable en su trabajo como asistente de chofer, el cual le fue concedido.

18. La demandante fue acomodada en su trabajo como asistente de chofer y efectuó dichas labores por espacio de 2 meses en el verano del 2019.

19. Como parte de sus funciones como asistente de chofer la demandante tenía que ayudar a los niños a subir los escalones de la guagua, acomodar y sentar los niños con necesidades especiales, levantar y acomodar sillas de ruedas de los niños incapacitados y cargar y acomodar los bultos de los estudiantes que requerían de asistencia.

20. La demandante llegaba a su casa luego del acomodo como asistente de chofer, destruida, con intensos dolores en su cuerpo especialmente en su espalda baja. El arranque y detente y el rebote de la guagua escolar aumentaban aún más su dolor.

21. La demandante tampoco pudo desempeñarse como asistente de chofer debido a su condición física luego del accidente.

22. El seguro médico provisto por su trabajo dejó de cubrir sus gastos médicos debido a que el accidente había ocurrido en Puerto Rico. Su seguro de automóvil del Estado de New Jersey tampoco cubrió sus gastos médicos por la misma razón.

23. La demandante fue informada que debido a que fue un accidente de tránsito que ocurrió en Puerto Rico, quien único podía cubrir los gastos médicos relacionados al accidente era la Administración de Compensaciones por Accidentes de Automóviles (ACAA).

24. Posteriormente, ACAA le notificó a la demandante que si no regresaba a Puerto Rico para el mes de octubre del 2019, para recibir su tratamiento médico le cerraban su caso.

25. Ante esta situación de salud, la demandante se vio forzada a renunciar a su trabajo en New Jersey el 22 de agosto de 2019 y mudarse a Puerto Rico para poder continuar su tratamiento médico a través de ACAA.

26. Una vez se mudó para Puerto Rico la demandante continuó su tratamiento médico. La demandante fue referida a una fisiatra de la ACAA quien le ordenó terapias físicas adicionales.

27. Luego de las terapias físicas la demandante fue referida a un especialista de manejo del dolor debido a los fuertes y constantes dolores que presentaba en su espalda baja.

28. La demandante recibió un bloqueo lumbar. El procedimiento de bloqueo consistió en dos inyecciones en el área lumbar que le ocasionaron fuertes dolores y llanto. El bloqueo ocasionó que le subiera la presión. Los fuertes dolores a consecuencia del bloqueo le duraron varios días.

29. Luego del bloqueo lumbar y debido a que no había mejoría en su condición, la demandante fue referida a un neurocirujano.

30. La demandante recibió tratamiento a través del neurocirujano de ACAA, Dr. Reinaldo De Jesús Rodríguez. El neurocirujano le ordenó nuevos estudios de Imagen de Resonancia Magnética (MRI), los que confirmaron que la demandante tenía los discos L4-L5 y L5-S1 herniados con desplazamiento, que estaban comprimiendo sus nervios y que por eso sentía adormecimiento de su pierna izquierda. La recomendación del neurocirujano fue una cirugía de fusión lumbar.

31. La demandante sintió mucho temor ante el hecho de que tenía que ser sometida a una delicada cirugía de su espalda baja.

32. El 29 de junio de 2020, la demandante fue sometida a una Cirugía de Fusión Intersomática Lateral extrema (XLIF) y una Cirugía de Fusión Intersomática Lumbar Transforaminal (TLIF) en el Hospital San Lucas de Ponce.

33. La demandante estuvo hospitalizada por espacio de 3 días y como parte de la cirugía le pusieron seis (6) tornillos, dos (2) varillas y dos (2) "spacers" en su espalda baja. Le tomaron un total de cincuenta y ocho (58) grapas de sutura en las tres (3) incisiones que tuvo como parte de su operación.

34. Las primeras semanas luego de la cirugía, una vez dada de alta del hospital, la demandante necesitaba ayuda para levantarse, acostarse, comer, ir al baño y bañarse y sentía mucho dolor.

35. El neurocirujano le ordenó terapias físicas adicionales. En total, entre las terapias físicas recibidas en New Jersey y las recibidas en Puerto Rico la demandante tomó treinta y cuatro (34) terapias físicas.

36. Posterior a la operación la demandante padece de dolores constantes en su espalda baja y la pierna izquierda que le obstaculizan dormir en las noches y en los días más fríos y de lluvia se agudizan estos dolores.

37. La demandante no puede manejar por períodos largos, se le caen las cosas de las manos, cuando estornuda su pierna izquierda se debilita y necesita de ayuda para vestirse.

38. Durante el interrogatorio directo la representación legal de la parte demandante le mostró las fotos anunciadas por la parte demandada las cuales consistían en diversas fotos de un perfil de ella en Facebook y sobre las mismas la demandante declaró que en efecto eran fotos de ella, la mayoría de ellas tomadas antes del accidente.

39. Antes del accidente la intención de la demandante era permanecer en el trabajo para el cual ya había obtenido la permanencia y retirarse del mismo, tal y como lo hizo su madre quien todavía se desempeña en el mismo trabajo que tenía la demandante y está a punto de retirarse.

40. Antes del accidente sufrido en plenas vacaciones en Puerto Rico la demandante, a sus 30 años de edad, estaba llena de vida, gozaba de buena salud, era activa e independiente. Ahora la demandante se siente profundamente triste y angustiada porque nunca tendrá la misma calidad de vida, activa, saludable e independiente que tenía antes del accidente.

41. Durante el contrainterrogatorio de la parte demandada declaró que luego del accidente, debido a que está sola en Puerto Rico, creó un perfil en la plataforma Linkedin para buscar trabajo, aproximadamente en el año 2022. Reconoció que dicho perfil establece que se desempeñó como "Administrative Clerk"para la compañía CIV Biomedical Services Corp.

42. Sobre las labores que hacía para esa compañía manifestó que le entregaban unos documentos de la compañía y récords de venta y que ella estaba encargada de organizarlos, digitalizarlos, subirlos a una nube y ese tipo de trabajo. Indicó que eso fue en el año 2022, aproximadamente, y que lo hacía en ocasiones desde su residencia. A cambio de este trabajo, recibió unos tratamientos en dicha clínica.

43. De igual manera la Sra. Rachele aceptó que en la actualidad puede cocinar, caminar por veredas naturales y participar de manifestaciones pero con dificultad y limitaciones.

44. Declaró que constantemente graba videos en Facebook sobre lo que está haciendo, incluyendo actividades de jardinería, manifestaciones y cocina, entre otro tipo de actividades limitadas.

45. Estableció que junto a su pareja actual han creado un ambiente autosostenible en la cual todo lo que consumen lo producen ellos y sobre esto declaró que ella ayuda en lo relacionado a la siembra lo cual lo hace en una mesa que le preparó su pareja.

46. La parte demandada confrontó a la demandante con un video publicado por ella en sus redes sociales (Facebook) en el cual aparece cerniendo tierra con un cernidor de madera y luego de ello muestra una montaña de tierra que manifiesta que ella misma ha cernido. Luego de mostrarle el video aceptó que en efecto sí ella había cernido toda esa tierra. Durante el video se aprecia cómo la demandante mueve el cernidor de madera en movimientos hacia al frente y hacia atrás, a la altura de sus hombros. En el mismo se apreciaba además como levantaba y golpeaba el cernidor para asentar la tierra.

47.    Declaró además que una vez al mes va a un río o arroyo en la comunidad Río Arriba en Añasco para recoger junto a su pareja agua del río. Declaró que esa agua es la que utilizan para su consumo personal. Aunque negó que ella cargue esos galones, si aceptó que puede subir y bajar por la vereda. Sobre ese particular la representación legal de la parte demandada le mostró un video publicado por ella en sus redes sociales (Facebook) donde se ve ella caminando, cuesta arriba y cuesta abajo, por una vereda natural.

48.    La Sra. Rachele admitió que puede conducir y usar una computadora pero por períodos cortos.

49.    La Sra. Rachele negó que hubiese padecido de condiciones de dolores de espalda previo al accidente. Sobre lo anterior, aclaró que lo que a ella le molestaba previo al accidente eran los hombros y el cuello.

50.    Durante el contrainterrogatorio se le mostró la visita del 13 de abril de 2019 (10 días antes del accidente) a la oficina de la enfermera de familia practicante (Family Nurse Practitoner FNP), Cynthia Pantazakos, donde la Sra. Rachel refiere que tiene una serie de dolores y malestares físicos que le interrumpen sus actividades del diario vivir. Sobre este particular la Sra. Rachele aceptó que para esa fecha tenía una serie de dolencias que le afectaban llevar a cabo ciertas acciones de su diario vivir, pero explicó que esas condiciones se circunscribían a dolores cervicales y específicamente en el área de cuello y hombros.

51.    Durante el recontrainterrogatorio aceptó que ya a los cinco meses de haber comenzado su trabajo, y previo al accidente, presentaba dolores cervicales por la posición que tenía que asumir para manejar la guagua escolar, ya que el guía le quedaba muy alto.

52.    Del testimonio del Dr. Héctor Cortés Santos, perito de daños de la parte demandante, surge que es un médico con especialidad en fisiatría, con 16 años en la práctica y oficinas en el pueblo de Caguas. Su encomienda en este caso fue evaluar el impedimento físico permanente de la demandante, relacionado al accidente de tránsito sufrido por ésta.

53.    Según el perito, el impedimento físico permanente es la pérdida de una parte o función de algún sistema y órgano de nuestro cuerpo. Mientras que la incapacidad es qué tipo de actividad se dificulta hacer debido al impedimento que tiene esa persona.

54.    El Dr. Cortés evaluó a la demandante el 26 de marzo de 2021. Como parte de su evaluación revisó los expedientes médicos de la demandante y utilizó los cuestionarios según requieren las guías de la 6ta edición de la American Medical Association.

55.    De la evidencia médica revisada por el Dr. Cortés surge que el día del accidente la demandante fue tratada en la Sala de Emergencias para dolor en el área de la boca, hombro izquierdo, lumbar y cervical. Se le tomaron a la demandante unas radiografías, y el tratamiento brindado consistió en inyectarla con Decadron y Tramadol, que son medicamentos para dolor y antinflamatorios y Flexeril.

56.    Surge de la evidencia médica revisada por el Dr. Cortés, que la fisiatra que ofreció servicios a través de ACAA, la Dra. Baucage, realizó unas pruebas a la demandante en octubre de 2019 y que éstas reflejaron unos diagnósticos de dolor en el cuello, la espalda baja, radiculopatía lumbar y herniación de núcleo pulposo en la región lumbar.

57. Explicó el Dr. Cortés que la radiculopatía lumbar, según las guías, es ese tipo de problema que viene de una de las raíces nerviosas, que se originan en la columna. En este caso particular de la demandante, es en la espalda baja donde está afectada la raíz nerviosa y, por eso, hay un tipo de sintomatología en la extremidad, que coincide con el nivel que está afectado. En la sintomatología de la pierna, puede haber unos signos y síntomas en la extremidad, pero es a consecuencia de un problema de las raíces de la columna lumbar.

58. Según el expediente médico de la demandante, luego de la visita a la fisiatra y como parte de su tratamiento la demandante recibió terapias físicas y tomó glucocorticoides y esteroides, siendo referida a un anestesiólogo. La demandante se sometió a un estudio de conducción nerviosa llamado electromiografía (EMG) que reflejó una radiculopatía lumbar bilateral moderada, relacionada directamente a los discos herniados en su espalda baja.

59. Asimismo, consta en el expediente médico que el 26 de noviembre de 2019, el anestesiólogo a través de la ACAA, Dr. Reinier Méndez, le realizó a la demandante unos bloqueos de las facetas lumbares de tres niveles, es decir, en tres (3) vértebras lumbares distintas, L tres (3), L cuatro (4) y L cinco (5). De igual forma, surge del expediente médico del anestesiólogo que no hubo alivio en la demandante luego de este bloqueo y por esta razón la refirió a un neurocirujano.

60. El Dr. Cortés constató en el expediente médico que el neurocirujano que brindó sus servicios a través de ACAA, Dr. Reinaldo De Jesús Rodríguez, evaluó a la demandante y ordenó otro MRI de la espalda baja, confirmando en sus diagnósticos que la demandante tenía dos discos herniados, L4-L5 y L5-S1, con desplazamiento, que estaban comprimiendo sus nervios, causando una radiculopatía lumbar y había ordenado el medicamento Gabapentín, que se utiliza para tratar la radiculopatía.

61. Según el Dr. Cortés, debido a que no había mejoría en la demandante, el neurocirujano recomendó a la demandante una Cirugía de Fusión Intersomática Lateral extrema (XLIF) y una Cirugía de Fusión Intersomática Lumbar Transforaminal (TLIF). Consta en el expediente médico que la demandante siguió las recomendaciones del neurocirujano y fue operada de su espalda baja.

62. De la lectura del expediente de la operación y las imágenes de las radiografías, el Dr. Cortés pudo confirmar que la operación de la demandante consistió en implantar en la columna vertebral de la demandante, seis (6) tornillos, dos (2) varillas y dos (2) "spacers" en los dos (2) niveles, el L cuatro (4) a L cinco (5) y L cinco (5) a S uno (1), bilateral, o sea, en ambos lados de la columna vertebral.

63. Surge del expediente de la operación que la demandante tenía una "stenosis" que es una estrechez de la salida del espacio de los nervios y esta estrechez haciendo una compresión en los nervios. También surge del expediente del neurocirujano que aún luego de la cirugía, tres meses después, la demandante continuaba con síntomas en el glúteo izquierdo, en el muslo izquierdo, adormecimiento, dolor en la extremidad derecha. La demandante continuaba con síntomas en ambas extremidades y caminaba, con un patrón antiálgico, o sea, que estaba coja y estaba utilizando bastón para caminar.

64. Consta en los expedientes revisados por el Dr. Cortés que, en el mes de noviembre de 2020, la fisiatra a través de ACAA, Dra. Baucage, evaluó a la demandante y encontró que seguía con dolor constante y severo de la espalda baja y le dificultaba la ambulación al caminar por el dolor. La prueba de levantar la pierna estirada fue

positiva, debilidad en las piernas y síntomas de ardor o sensación de ardor en las extremidades. Eso en términos médicos se conoce como parestesias. Las parestesias pueden ser ardor, carcomillo, hormigueo, pulsante y corriente.

65.    Surge que de nuevo la fisiatra hizo el diagnóstico de dolor de espalda baja, con radiculopatía bilateral, post-operación lumbar. Nuevamente le mandaron esteroides, Zanaflex, que es un relajante muscular y sesiones adicionales de terapias físicas. La radiculopatía es bilateral porque es en ambos lados de la columna vertebral y afecta ambas piernas. Se le recetó Cymbalta, que es un medicamento que se utiliza para dolor músculo-esqueletal crónico.

66.    Consta en el expediente médico que el 21 de enero de 2021, la demandante fue evaluada nuevamente por el neurocirujano quien consignó en el expediente que la demandante todavía continuaba con fuertes dolores de espalda, aún luego de la operación, movimientos involuntarios y temblores en su pierna izquierda. La demandante presentó no solamente síntomas sensoriales, sino que también síntomas motores en su extremidad izquierda y utilizaba el bastón para caminar.

67.    Al momento de su evaluación con el perito Dr. Cortés, la demandante presentaba sensación de quemazón en la pierna izquierda, tenía adormecimiento en el muslo izquierdo y una sensación punzante en la planta del pie izquierdo.

68.    Mientras el Dr. Cortés entrevistaba a la demandante, observó una conducta de dolor, un comportamiento de dolor. La demandante continuamente cambiaba de posición mientras estaba sentada, liberando presión para un lado y para el otro lado. Según el Dr. Cortés, esto sucede cuando la persona tiene un dolor crónico y necesita hacer ese tipo de cambio de posición para aliviarse. El Dr. Cortés expresó que la demandante tenía un poco de dificultad en las transferencias, tales como: sentarse en una silla, subirse y bajarse de la camilla y caminaba coja de su pierna izquierda.

69.    Las pruebas realizadas por el perito Dr. Cortés a la demandante confirmaron los diagnósticos de distensión cervical y discos lumbares herniados en múltiples niveles con radiculopatía lumbar. Expresó el Dr. Cortés, que existe certeza médica de que estos diagnósticos que se obtuvieron de la evidencia y tratamiento médico están directamente relacionados al accidente de tránsito ocurrido en el 23 de abril de 2019.

70.    El Dr. Cortés declaró en el juicio, que el documento médico presentado que tiene fecha del 26 de enero de 2019 el cual está firmado por una enfermera práctica de familia (FNP) de apellido Pantazakos, que contenía como diagnóstico dolor de espalda baja es insuficiente para establecer que la demandante tenía condiciones preexistentes en su espalda baja. Dicho documento no fue preparado por un doctor en medicina y no contiene ningún examen músculo-esqueletal para llegar a esa conclusión, no está basado en ningún estudio médico como radiografías o MRI, por lo que es insuficiente para establecer que la demandante tenía un impedimento previo al accidente.

71.    El Dr. Cortés, utilizando la sexta (6ta) edición de las Guías de la Asociación Médica Americana para la determinación de impedimento permanente y bajo los diagnósticos de las hernias que tuvo entre L cuatro (4) y L cinco (5) y S cinco (5) y S uno (1) con radiculopatía lumbar bilateral, luego de haber alcanzado el máximo mejoramiento médico, la demandante obtuvo un valor de diecisiete por ciento (17%) de impedimento físico permanente, esto directamente relacionado al accidente de tránsito del 23 de abril de 2019. Es permanente porque ese porciento no va a cambiar en el futuro y la demandante tendrá como mínimo ese porciento de impedimento físico por el resto de su vida.

72. Asimismo, la parte demandante presentó como perito de daños económicos al Contador Público Autorizado, Elías L. Fernández Pérez, quien es especialista en Contribuciones ante el Departamento de Hacienda y preparador registrado en el Departamento de Rentas Internas Federal.

73. Como parte de los documentos revisados para emitir su opinión el perito Elías Fernández utilizó las planillas radicadas por la demandante para los años 2018, 2019 y 2020, su Resumé, el Informe pericial del perito de daños de la parte demandante Dr. Cortés y una carta del director de nómina del patrono de la demandante. Según expresó su encomienda fue determinar la pérdida de ingresos de la demandante.

74. El perito Fernández explicó que la expectativa de vida útil de la demandante es hasta los 67 años que es la edad en que obtendría los beneficios máximos de Seguro Social. En cuanto a la metodología utilizada el perito declaró que el primer paso fue establecer que la parte que reclama tenía un ingreso que esperaba generar, o sea, que tenía una expectativa de generar un ingreso, esto es lo que se llama ingreso base. En este caso el ingreso base de la demandante es de $23,155.00, que era el ingreso que devengaba como empleada con permanencia en el Toms River Regional School District, al momento del accidente y el mínimo que esperaba generar por el resto de su permanencia.

75. El segundo paso es considerar la posibilidad de que estos ingresos aumenten a través del tiempo y establecer una tasa de crecimiento anual. La evidencia histórica demuestra que los salarios aumentan con el pasar del tiempo debido a la inflación y productividad. La contabilidad forense ha establecido que un promedio de 3% a 5% de crecimiento anual es razonable. El CPA Fernández utilizó el promedio más bajo en su cómputo de tasa de crecimiento anual, o sea un 3%.

76. El tercer paso fue establecer la expectativa de vida útil de la demandante que es hasta los 67 años. Desde la fecha del accidente cuando la demandante tenía 30 años, hasta la edad de expectativa de vida de útil, 67 años, en el caso de la demandante sería un total de 37 años de expectativa de vida de útil.

77. Por otra parte, el Dr. Jaime Del Valle, perito economista de daños económicos de la parte demandada declaró que para computar el ingreso base de la demandante, utilizó un promedio de sus salarios desde el año 2014 al 2018 que incluía sus ingresos cuando trabajaba a tiempo parcial, antes de ser empleada permanente y en los cuales sus ingresos eran mucho menores a los que tuvo una vez obtuvo su permanencia en el Departamento de Transportación de New Jersey.

78. Del Valle declaró que al momento de determinar el lucro cesante de una persona hay que tomar en cuenta factores de incertidumbre, como por ejemplo el que la persona quiera voluntariamente participar de la fuerza laboral, que la persona esté apta para participar, condiciones de salud, que vaya a estar viva durante el período de su edad productiva y la expectativa de vida productiva, lo que se conoce como la metodología Life-Participation and Employment (LPE).

79. Utilizando ese promedio estableció un ingreso base de la demandante en $9,340.00 para todos y cada uno de los 37 años de vida útil de la demandante hasta el año 2055.

80. Este Tribunal entiende, evaluados los infromes periciales económicos y el testimonio de los peritos, que no es razonable establecer que la demandante estaría devengando un ingreso de $9,340.00 al año por los próximos 37 años de su vida útil, hasta el

año 2055 y por lo tanto no es razonable establecer el lucro cesante de la demandante en la cantidad de $97,706.00.

81.　El Dr. Del Valle reconoció que para efectos de su informe no tomó en consideración el hecho de que al momento del accidente la demandante había obtenido una plaza permanente como chofer de guaguas escolares en el Departamento de Transportación de New Jersey en la cual su ingreso era de $23,155.00 anuales.

82.　El Dr. Jaime Del Valle reconoció en su testimonio que no está de acuerdo en que se aplique el 6% como tasa de descuento que él mismo utilizó en su informe pericial en este caso, por considerarlo alto y que inclusive redactó un artículo de revista titulado Jurisprudencia o Prudencia Judicial, Revista Jurídica de la UPR, Vol. 90, Páginas 925-948, sosteniendo que no está de acuerdo en que se use la tasa de descuento de 6% para computar el lucro cesante. En la página 935 de dicho artículo sostiene que la tasa de descuento debe ser el rendimiento que una persona pueda obtener en el mercado en instrumentos líquidos pero seguros, tal y como lo hizo el perito de daños económicos de la parte demandante.

83.　Sin embargo, nos resulta razonable el segundo estimado de lucro cesante contenido en el Anejo 4 del Informe Pericial del perito de la parte demandada el Dr. Jaime Del Valle, que sostiene la posibilidad de que los ingresos de la demandante aumenten a través del tiempo y que establece que el lucro cesante de la Sra. Caterina Rachele por los 37 años de vida útil se valora en la suma de $356,203.00.

84.　Por otra parte, el Dr. Javier Espina Martí, perito de daños de la parte demandante, posee un doctorado en terapia física de la Universidad del Sur de la Florida y se dedica exclusivamente a pruebas de capacidad funcional desde el año 1998.

85.　Según el Dr. Espina, la prueba de capacidad funcional es una prueba que mide las habilidades físicas de una persona para llevar a cabo cierto trabajo y busca determinar si ese empleado está capacitado o no, para razonable y continuamente llevar a cabo sus funciones. Esta prueba evalúa la disfunción de la persona a nivel de movimiento físico-corporal.

86.　Como parte de su práctica, el Dr. Espina realiza pruebas de capacidad funcional para el Departo de la Defensa de los Estados Unidos, el FBI, Departamento de Veteranos, Oficina de Administración de Tribunales y Administración de Corrección, entre otros.

87.　Expresó que su encomienda en este caso fue evaluar la capacidad funcional residual de la demandante. La capacidad funcional residual es el sobrante de lo que una persona saludable puede hacer en su diario vivir, cómo se manifiestan los diagnósticos a nivel funcional y qué le queda a esta persona para llevar a cabo tareas, ya sea del diario vivir o tareas ocupacionales.

88.　Declaró el Dr. Espina que la demandante tiene unos impedimentos médicos que resultan en una limitación funcional severa o significativa, que erosiona sus demandas ocupacionales y no está competente para retomar su trabajo o cualquier trabajo, ni a tiempo completo ni a tiempo parcial, de manera continua y razonable en la economía nacional. Su prognosis funcional futura es pobre y no se espera que mejore permanentemente.

89.　Como parte de su evaluación el Dr. Espina revisó la prueba médica del tratamiento de la demandante admitida en evidencia que incluye MRI's, CT Scans, cirugía y terapias físicas, en otras.

90. En cuanto a las actividades del diario vivir como ir de compras, preparar comidas, modo de transporte y labores de mantenimiento del hogar, la demandante necesita ayuda para realizar estas debido a sus limitaciones físicas desarrolladas a consecuencia del accidente.

91. En cuanto a la clasificación de demanda física, el Dr. Espina declaró que, en base a su evaluación, la clasificación de la demandante es menos que sedentaria. Esta clasificación en agencias como el Seguro Social, lo ven como una causa de discapacidad total y permanente.

92. Declaró el Dr. Espina que la demandante no puede llevar a cabo un trabajo sedentario como lo sería un trabajo donde tendría que levantar, cargar, empujar hasta diez (10) libras, estar sentada o de pie cuatro (4) u ocho (8) horas al día y hacer trabajos de oficina.

93. La demandante no puede estar sentada por más de una (1) hora corrida o parada más de una (1) corrida, sin tener que estar pidiendo un descanso y no puede concentrarse porque el dolor no le permite y, por eso, es que su nivel es menos que sedentario.

94. Las extremidades superiores y extremidades inferiores de la demandante se han visto negativamente afectadas a consecuencia del accidente por lo que la demandante presenta problemas para subir y bajar sus brazos, agarrar y cortar, caminar, correr, subir escaleras, bajar escaleras y brincar.

95. Considerando sus impedimentos y discapacidad funcional no existen habilidades de trabajo transferibles a otros trabajos que se puedan aplicar a la demandante.

96. La demandante presenta como factores agravantes de su situación laboral funcional que no puede mantener actividad física de manera prolongada y sostenida por más de 10 minutos corridos y no puede mantener la postura de sus extremidades superiores por más de 5 minutos corridos.

97. La demandante tiene dos cicatrices post-operatorias en su área lumbar y una cicatriz lateral que miden 6 centímetros cada una producto su cirugía de la espalda baja.

98. En la prueba de movimientos lumbosacrales se demostró que sus movimientos no son fluidos, son movimientos protegidos para no lastimarse, necesita ayuda para ponerse y quitarse los zapatos, ayuda para acostarse y sentarse en la camilla y para ponerse de pie. La demandante no pudo caminar en puntillas ni en sus talones. La demandante no podía mantener su balance y necesitó asistencia.

99. Las pruebas realizadas por el Dr. Espina reflejan que la demandante tiene una seria limitación funcional a nivel lumbar. La demandante tiene serias limitaciones en los movimientos de flexión, extensión, flexión lateral y rotación de su espalda baja. También las pruebas reflejaron que la demandante tiene una limitación moderada en cuanto a su cadera, sus rodillas y tobillos.

100. El Dr. Espina realizó una prueba llamada "Time Up and test" o "TUG Test". Es una prueba de alta confiabilidad que se utilizar para identificar el funcionamiento de las extremidades inferiores, problemas de movilidad y balance y el riesgo a sufrir caídas de una persona. Los resultados de esta prueba reflejaron que la demandante tiene un riesgo a sufrir caídas debido a los problemas de movilidad y balance que tiene en sus extremidades inferiores.

101. Declaró el Dr. Espina que la demandante no puede realizar ningún trabajo en la economía formal a tiempo parcial ni a tiempo completo debido a que su condición física le ocasiona una falta de

continuidad razonable en cualquier empleo. La demandante no puede trabajar por una cantidad de tiempo razonable ininterrumpidamente, sin faltar al trabajo por citas médicas, tendría que faltar al trabajo por los fuertes dolores que sufre y su producción en cualquier trabajo sería baja en lo que respecta a las tareas y deberes de una ocupación laboral.

102. Si la demandante decidiera realizar algún tipo de trabajo en la economía formal, el riesgo de recrudecer aún más sus lesiones aumentaría porque la magnitud de sus daños es de carácter permanente.

103. Durante el contrainterrogatorio se le preguntó al Dr. Espina, cuándo fue la última vez que evaluó la capacidad funcional de la parte demandante. A ello contestó que fue a la fecha de su evaluación el 14 de septiembre de 2022. Este declaró que posterior a esa fecha no revisó documento alguno, expediente médico ni llevó examen alguno.

104. Sobre las características de los exámenes que éste llevó a cabo declaró y aceptó que eran exámenes subjetivos donde los movimientos son activos. Por movimientos activos éste describió que son movimientos donde la demandante, sin asistencia de él, llevó a cabo los movimientos y en el momento en que ésta manifiesta alguna queja o incomodidad, hasta ahí se toma la medida y/o fotografía.

105. De igual manera, declaró en el contrainterrogatorio que, si la persona evaluada manifestaba que hasta cierto punto podía hacer un movimiento, en ese momento tomaba la medida. 106. El Dr. Espina aceptó que existían discrepancias entre su examen físico y el del Dr. Cortés.

107. A este Tribunal le merece entera credibilidad el testimonio del Dr. Espina a los efectos de que es su conclusión, basada en los exámenes y las pruebas que le realizó a la demandante, que ésta se encontraba incapacitada permanentemente de llevar a cabo cualquier tipo de trabajo de manera continua y razonable en la economía nacional.

108. La parte demandada presentó el testimonio del Sr. José Rodríguez, investigador privado, quien declaró que se desempeña como investigador privado aproximadamente desde finales de la década de los setenta y que su trabajo en el presente caso consistió en dar un seguimiento y llevar a cabo unas investigaciones de inteligencia y redes sociales para corroborar las actividades de la Sra. Caterina Rachele y corroborar si se podía confirmar las incapacidades que alega en la demanda.

109. Declaró que su trabajo consistió en dos partes. La primera, la cual se llevó cabo durante el año 2022 y consistió en un trabajo de inteligencia para localizar a la demandante y una investigación de las redes sociales de la misma. La segunda parte consistió en un seguimiento que se le dio a la demandante el pasado 21 de octubre de 2023.

110. Sobre la investigación de las redes sociales declaró que dicha investigación arrojó que la Sra. Rachele activamente pone videos en las redes sociales donde se puede observar llevando a cabo actividades como jardinería, agrícola y guiando.

111. De igual forma declaró que el seguimiento del 21 de octubre de 2023 reflejó a la demandante manejando su vehículo desde Quebradillas hasta Isabela, llegando hasta un centro comercial donde hizo compra en un supermercado y luego se dirigió a una playa donde estuvo sentada en un banco de cemento leyendo documentos sin problema. Expresó que durante ese tiempo se

pudo ver a la demandante caminando y que no utilizaba ningún bastón.

112. El Dr. Suarez Castro, perito de la parte demandada, declaró de manera cónsona a los hallazgos de su informe pericial y describió el examen físico que le realizó a la demandante.

113. El Dr. Suárez Castro declaró que su informe únicamente versaba sobre el impedimento físico de la demandante.

114. Utilizando la sexta edición de las Guías de la Asociación Médica Americana para la determinación de impedimento permanente y bajo los diagnósticos de las hernias que tuvo entre L cuatro (4) y L cinco (5) y S cinco (5) y S uno (1) con radiculopatía lumbar, el Dr. Suarez Castro le dio un valor de diecisiete por ciento (17%) de impedimento físico permanente a la demandante, directamente relacionado al accidente de tránsito del 23 de abril de 2019, coincidiendo con el perito de la parte demandante Dr. Héctor Cortés. Conforme a las determinaciones de hechos antes expresadas consignamos las siguientes conclusiones de derecho.

Posteriormente, el 16 de enero de 2025, la apelada-recurrida presentó un "*Memorándum de Costas*." A través de este, solicitó que se les ordenara a los apelantes-peticionarios pagar la cantidad de $15,157.34 en concepto de costas a tenor de lo establecido en la Regla 44.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1.

En reacción, el 27 de enero de 2025, los apelantes-peticionarios presentaron "*Oposición a Memorando de Costas*." Solicitaron que se pospusiese la adjudicación del "*Memorándum de Costas*" hasta que el foro apelativo resolviese el recurso de apelación que en esos momentos pensaban presentar. A su vez, argumentaron que es improcedente conceder a la apelada-recurrida las costas relacionadas a los gastos periciales, a las deposiciones y servicios de emplazamiento por tratarse de partidas irrazonables.

Tras evaluar los escritos presentados, el 28 de enero de 2025, el foro primario notificó una "*Orden*." Mediante esta, determinó mantener en suspenso la adjudicación de la petición de costas hasta que la "*Sentencia*" dictaminada adviniera final y firme.

Ante ello, el 30 de enero de 2025, la apelada-recurrida presentó "*Réplica a Oposición a Memorando de Costas y Solicitud de Reconsideración en cuanto a mantener en suspenso la determinación de costas*." Sostuvo, que a tenor de la Regla 44. 1 (b) de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1 (b), el foro primario podía adjudicar la solicitud de

costas. Aseveró, que ello no obstaculizaba la apelación de la "*Sentencia*," dado que, si alguna de las partes decidiese recurrir de la determinación de costas, el ordenamiento procesal civil permite que el recurso discrecional de revisión de costas se consolide con el recurso de apelación. De otra parte, arguyó que las partidas de costas solicitas son razonables y representan los gastos necesarios de la tramitación del litigio. Así pues, peticionó al tribunal de instancia que declarara *Ha Lugar* el "*Memorándum de Costas.*"

El 3 de febrero de 2025, el foro primario le concedió un término de diez (10) días a los apelantes-peticionarios para que se expresaran en torno a la "*Réplica a Oposición a Memorando de Costas y Solicitud de Reconsideración en cuanto a mantener en suspenso la determinación de costas.*"

Aún pendiente la adjudicación de la solicitud de costas, el 6 de febrero de 2025, los apelantes-peticionarios recurrieron ante esta Curia de la "*Sentencia*" notificada el 9 de enero de 2025. En su comparecencia, presentaron un recurso de apelación bajo la designación alfanumérica **KLAN202500093**. A través de este esbozaron los siguientes señalamientos de error:

> Erró el Tribunal de Primera Instancia al conceder una compensación exagerada de $523,972.60 a la demandante Caterina Rachele por concepto de sus daños físicos, impedimento físico permanente y sus sufrimientos y angustias mentales. Dicha partida resulta exagerada e improcedentes en comparación con las compensaciones otorgadas en casos similares. Erró además el TPI al ignorar los casos existentes del Tribunal Supremo, y utilizar un solo caso del Tribunal Apelativo que carece de un recuento detallado de la extensión de los daños.

> Erró el tribunal de primera instancia al conceder $356,203.00 por concepto de lucro cesante, al determinar que la demandante está incapacitada para trabajar. La prueba pericial de la parte demandante no fue conclusiva de que al día de hoy la parte demandante se encuentre incapacitada para llevar a cabo ningún tipo de trabajo en la economía nacional y por tanto no procedía otorgar compensación por lucro cesante.

> Erró el Tribunal de Primera Instancia al otorgarle credibilidad al testimonio del Dr. Espina, determinando que la demandante estaba incapacitada para trabajar, cuando el propio TPI determinó en su sentencia que [sic] posterior al accidente la demandante trabajó y que la demandante lleva a cabo actividades de variada naturaleza en su diario vivir.

Erró el tribunal de primera instancia al otorgarle credibilidad al testimonio del Dr. Espina, cuando el propio TPI determinó en su sentencia que los exámenes que llevo a cabo el Dr. Espina eran exámenes subjetivos y existían discrepancias entre el examen físico que llevo a cabo el Dr. Espina y el que llevó a cabo el Dr. Cortés, también perito de la parte demandante.

Erró el Tribunal de Primera Instancia al imponer temeridad y honorarios de abogados a la parte apelante frente a un caso donde existía una controversia real y defendible sobre la alegada incapacidad permanente de la demandante y serias discrepancias entre las opiniones periciales en cuanto a la pérdida económica alegada.

Posterior a la presentación del recurso de apelación, el 6 de marzo de 2025, el foro primario notificó la "*Orden*" que hoy también se encuentra ante nuestra consideración. Mediante esta, el tribunal de instancia declaró *Ha Lugar* el "*Memorándum de Costas.*" En consecuencia, ordenó a los apelantes-peticionarios que pagaran a la apelada-recurrida la cantidad de $15,157.34 en concepto de costas de litigio.

En desacuerdo, el 28 de marzo de 2025, los apelantes-peticionarios presentaron ante este Tribunal un auto de *certiorari* de designación alfanumérica **KLCE202500315**. A través de este esbozaron los siguientes señalamientos de error:

Erró el Tribunal de Primera Instancia al declarar Con Lugar el Memorando de Costas presentados por la parte demandante, toda vez que dicho foro carecía de jurisdicción para atender y disponer del mismo toda vez que se había presentado un recurso de apelación.

Erró el Tribunal de Primera Instancia al aprobar el memorando de costas presentado por la parte demandante, a pesar de que este no cumplió con los requisitos de la regla 44.1 de procedimiento civil al no justificar adecuadamente la razonabilidad, necesidad y utilidad de las partidas reclamadas.

En cuanto al recurso **KLAN202500093**, el 12 de marzo de 2025, los apelantes-peticionarios presentaron "*Moción Sometiendo Transcripción de la Prueba Estipulada.*" Así las cosas, el 4 de abril de 2025, dicha parte presentó su "*Alegato Suplementario de la Parte Apelante*" para el recurso **KLAN202500093.**

El 7 abril de 2025 los recursos **KLAN202500093** y **KLCE202500315** fueron consolidados. En la misma fecha, este Tribunal ordenó a la apelada-recurrida que presentara su alegato suplementario del recurso

**KLAN202500093** y su oposición al recurso de *certiorari* del caso de designación alfanumérica **KLCE202500315**.

En cumplimiento de lo ordenado, el 23 de abril de 2025, la apelada-recurrida presentó su "*Alegato de la Parte Apelada*" para el caso **KLAN202500093**. En misma fecha, presentó una "*Oposición a Certiorari*" para el recurso **KLCE202500315**.

Con el beneficio de la comparecencia de ambas partes, pasamos a esbozar el marco legal pertinente a los recursos consolidados.

**II**.

**Exposición doctrinal atinente al recurso KLAN202500093:**

**A.    Daños y Perjuicios:**

El Art. 1802 de nuestro Código Civil expone que el que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. 31 LPRA sec. 5141.[8] Para que surja la responsabilidad extracontractual deben concurrir los siguientes tres elementos: un daño, una acción u omisión negligente o culposa y, la correspondiente relación causal entre ambos. *Toro Aponte v. E.L.A.*, 142 DPR 464, 472-473 (1997).

En particular, al determinar si se incurrió o no en responsabilidad civil debido a una omisión, los tribunales deberán considerar los siguientes factores, a saber: i) la existencia o inexistencia de un deber jurídico de actuar por parte del alegado causante del daño y ii) si de haberse realizado el acto omitido se hubiera evitado el daño. *Hernández Vélez v. Televicentro*, 168 DPR 803, 812 (2006). Así, para que se incurra en negligencia como resultado de una omisión, tiene que existir un deber de cuidado impuesto o reconocido por ley y que ocurra el quebrantamiento de ese deber. (Citas omitidas). *Íd*.

---

[8] El artículo 1815 del Código Civil de 2020, incluye la siguiente disposición: "[l]a responsabilidad extracontractual, tanto en su extensión como su naturaleza, se determina por la ley vigente en el momento en que ocurrió el acto u omisión que da lugar a dicha responsabilidad." 31 LPRA sec. 11720. Siendo así, por tratarse el presente caso de hechos acontecidos bajo la vigencia del Código Civil de 1930, dispondremos de la controversia a tenor con el marco doctrinal entonces vigente. Véase, *Cruz Flores et al. v. Hosp. Ryder et al.*, 210 DPR 465, 483 (2022).

El concepto culpa en este artículo es tan amplio como la conducta de los seres humanos e incluye cualquier falta de una persona que produce un mal o un daño. *Rivera v. S.L.G. Díaz*, 165 DPR 408, 421 (2005); *Bonilla v. Chardón*, 118 DPR 599, 610-611 (1987). En particular, "[l]a culpa consiste en la omisión de la diligencia exigible, mediante cuyo empleo podría haberse evitado el resultado dañoso." *Jiménez v. Pelegrina Espinet*, 112 DPR 700, 704 (1982). De otra parte, la negligencia consiste en no anticipar ni prever las consecuencias racionales de un acto, o la omisión de un acto, que una persona prudente y razonable habría previsto en las mismas circunstancias. *Rivera v. S.L.G. Díaz*, supra, pág. 422; *Toro Aponte v. E.L.A.*, supra, pág. 473.

**B.    Valoración de Daños:**

Señalamos que el ordenamiento de Responsabilidad Civil Extracontractual es de naturaleza reparadora. Ante ello, el deber de resarcir es comparable con una subrogación real, por medio de la cual la valoración económica ocupará el lugar de los daños y perjuicios sufridos. *Sucn. Mena Pamias et al. v. Meléndez et al.,* 212 DPR 758, 769 (2023). Sabido es que la tarea judicial de estimar y valorar los daños es difícil y angustiosa, debido a que no existe un sistema de computación que permita llegar a un resultado exacto con el cual todas las partes queden complacidas y satisfechas. *Santiago Montañez v Fressenius Medical,* 195 DPR 476, 490 (2016) y casos allí citados.

Particularmente, "no existen fórmulas científicas que provean un resultado exacto para indicar cómo se justiprecia el dolor y el sufrimiento causado." *Sucn. Mena Pamias et al. v. Meléndez, et al.,* supra, pág. 769. A tenor con lo anterior, el ejercicio de valoración de daños tiene ciertos elementos especulativos que dependen en parte del juzgador de los hechos y del sentido de la justicia. *Id.* Por ello, como regla general los tribunales apelativos no deben intervenir con la valoración de daños que realiza el foro primario, salvo que esta sea ridículamente baja o exageradamente alta. *Meléndez Vega v. El Vocero de PR,* 189 DPR 123,

203 (2013). Lo anterior responde, en parte a que es dicho foro el que tiene contacto directo con la prueba testifical presentada y, por ende, está en mejor posición de emitir un juicio sobre la valorización de daños. *Rodríguez et al v. Hospital et al*, 186 DPR 889, 909 (2012).

Así pues, para evaluar si la compensación concedida por el Tribunal de Primera Instancia es una ridículamente baja o exageradamente alta, debe evaluarse la prueba desfilada en el caso, así como cuantías otorgadas en casos similares resueltos anteriormente. *Herrera Rivera v. SLG Ramírez-Vicéns*, 179 DPR 774, 785 (2010). Tales sentencias, y las indemnizaciones concedidas en ellas, constituyen un punto de partida y referencia útil para pasar juicio sobre las concesiones otorgadas por el foro primario. Ello aun cuando debemos reconocer que no existen dos casos exactamente iguales y que cada caso es distinguible según sus circunstancias particulares. *Rodríguez et al v. Hospital et al,* supra, pág. 909-910. En todo caso, estas compensaciones otorgadas en casos anteriores deben ajustarse a su valor presente. *Meléndez Vega v. El Vocero de PR*, supra, a la pág. 204.

**C.    Prueba Pericial:**

Es norma establecida que los tribunales apelativos se encuentran en la misma posición que foro sentenciador para evaluar la prueba pericial. *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021). De esta manera, el foro revisor podrá adoptar su propio criterio de apreciación y descartar la prueba pericial, aunque resulte técnicamente correcta. *Id.* Ello, con el fin de proveer el justo valor probatorio. *Id.* A tenor de lo anterior, la Regla 702 de las Reglas de Evidencia nos ilustra con relación a la forma en que se evaluará el valor probatorio de una prueba pericial. Así, dispone que el valor probatorio dependerá de los siguientes factores:

> (a)    [s]i el testimonio está basado en hechos o información suficiente;
>
> (b)    si el testimonio es el producto de principios y métodos confiables;
>
> (c)    si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso;

(d)      si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica;

(e)      las calificaciones o credenciales de la persona testigo, y

(f)      la parcialidad de la persona testigo

32 LPRA Ap. VI, R. 702.

A pesar de que un mínimo de evidencia es suficiente para establecer la cualificación de un perito, si se presentan credenciales excelentes de este, las mismas contribuirán al valor probatorio de la evidencia pericial. *Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R.,* 150, 664 DPR 658 (2000)., citando a E.L. Chiesa, P.P.P.-I, Evidencia ob. Cit. a la pág. 245.

**D.      Lucro Cesante**:

El lucro cesante ha sido definido jurisprudencialmente "como la interrupción, disminución o cese en los ingresos de una persona [que incluye] la pérdida, total o parcial, de su capacidad productiva." *Sucn. Mena Pamias et al. v. Meléndez*, *et al.,* supra, pág. 772. En esencia, la procedencia de la indemnización por lucro cesante estriba en la pérdida de la esperanza fundada y razonable de unos beneficios futuros por parte de la persona agraviada. *Id.* Es decir, el daño a reparar es la ganancia futura frustrada que con cierta probabilidad se habría de recibir en el curso normal de las cosas. *S.L.G. Rodríguez v. Nationwide*, 156 DPR 614, 624 (2002).

Cabe señalar, que la persona agraviada no tiene que demostrar con certeza absoluta que habría de recibir las ganancias estimadas. *S.L.G. Rodríguez v. Nationwide*, supra, pág. 624. El criterio rector para valorizar la partida de lucro cesante es la razonabilidad de la cuantía a conceder. *Id.,* pág*.* 625. A tono de ello, las ecuaciones matemáticas utilizadas en decisiones previas no son una fórmula fija y rígida que deba aplicarse estrictamente en toda determinación de lucro cesante. *Id.* Esto, debido a que las fórmulas matemáticas están sujetas a los ajustes necesarios para que respondan a las situaciones del momento. *Id.*

**E.      Honorarios de Abogado:**

La Regla 44.1 (d) de Procedimiento Civil, 32 LPRA Ap. V, reconoce la facultad discrecional del foro de primera instancia para imponer honorarios por temeridad al disponer que "[e]n caso que cualquier parte o su abogado o abogada haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al o a la responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda corresponda a tal conducta". Véase, *Andamios de P.R. v. JPH Contractors, Corp.*, 179 DPR 503, 519-520 (2010). Esta sanción pecuniaria por conducta temeraria tiene el propósito de disuadir la litigación frívola y fomentar las transacciones mediante sanciones que compensen a la parte victoriosa los perjuicios económicos y las molestias producto de la temeridad de la otra parte. *Marrero Rosado v. Marrero Rosado,* 178 DPR 476, 505 (2010).

Aun cuando la norma procesal no define expresamente el concepto temeridad, en *Fernández v. San Juan Cement Co. Inc.,*118 DPR 713, 718 (1987), el Tribunal Supremo citó la definición del comentarista Hiram Sánchez Martínez, la cual reza como sigue:

> La temeridad es una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y administración de la justicia. También sujeta al litigante inocente a la ordalía del proceso judicial y lo expone a gastos innecesarios y a la contratación de servicios profesionales, incluyendo abogados, con el gravamen a veces exorbitante para su peculio. H. Sánchez, *Rebelde sin Costas*, 4(2) Boletín Judicial 14 (1982).

Nuestro Alto Foro ha expresado, además, que "un litigante actúa con temeridad cuando con terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconvenientes de un pleito". *S.L.G. Flores–Jiménez v. Colberg,* 173 DPR 843, 866 (2008), seguido en *C.O.P.R. v. S.P.U.*, 181 DPR 299, 342 (2011). Ha opinado también que "es temerario quien niega totalmente su responsabilidad en los hechos que motivan la demanda, cuando conocía o debió conocer, que su negligencia causó o contribuyó al daño sufrido y obliga a la parte demandante a litigar extensamente su caso, especialmente el aspecto de

la negligencia". *SLG González-Figueroa v. SLG et al.* 209 DPR 138, 150 (2022).

La determinación de si un litigante ha incurrido en temeridad descansa en la sana discreción del tribunal sentenciador. *Torres Vélez v. Soto Hernández*, 189 DPR 972, 993-994 (2013). Una vez determinada la temeridad, la imposición de honorarios de abogado es mandatorio. *Montañez v. U.P.R.,* 156 DPR 395, 442 (2002). Igualmente, le corresponde al tribunal primario imponer la cuantía que entienda procedente en respuesta a la conducta temeraria. *Meléndez Vega v. El Vocero de PR,* supra, pág. 211 (2013). De manera que, los tribunales descansarán en su discreción y determinarán la suma a concederse por: (1) el grado de temeridad; (2) el trabajo realizado; (3) la duración y naturaleza del litigio; (4) la cuantía involucrada, y (5) el nivel profesional de los abogados. *C.O.P.R. v. S.P.U., supra*, págs. 342-343.

Ante ello, los tribunales apelativos no debemos intervenir con el ejercicio de esa discreción, salvo que se demuestre que hubo un craso abuso de discreción, que el foro recurrido actuó con prejuicio o parcialidad, que se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo, o cuando la cuantía impuesta sea excesiva. *P.R. Oil v. Dayco,* 164 DPR 486, 511 (2005).

**Exposición doctrinal atinente al recurso KLCE202500315:**

**A.      Recurso de *Certiorari*:**

El *certiorari* es un recurso extraordinario mediante el cual un tribunal de jerarquía superior puede revisar a su discreción una decisión de un tribunal inferior. *Rivera et al v. Arcos Dorados et al.*, 212 DPR 194, 207 (2023); *Orthopedics Prod. Of Puerto Rico, LLC v. Medshape, Inc.*, 207 DPR 994, 1004 (2021); Art. 670 del Código de Enjuiciamiento Civil de 1933, conocido como Ley de Recursos Extraordinarios, 32 LPRA sec. 3491. La característica distintiva del *certiorari* "se asienta en la discreción encomendada al tribunal revisor para autorizar su expedición y adjudicar sus méritos". *Íd*. Ahora bien, el ejercicio de esta discreción no es absoluto.

Por ello, la Regla 52.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 52.1, establece una serie de instancias en las que los foros apelativos pueden ejercer su facultad revisora:

> El recurso de certiorari para revisar resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia, solamente será expedido por el Tribunal de Apelaciones cuando se recurra de una resolución u orden bajo las Reglas 56 y 57 o de la denegatoria de una moción de carácter dispositivo. No obstante, y por excepción a lo dispuesto anteriormente, el Tribunal de Apelaciones podrá revisar órdenes o resoluciones interlocutorias dictadas por el Tribunal de Primera Instancia cuando se recurra de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciarios, anotaciones de rebeldía, en casos de relaciones de familia, en casos que revistan interés público o en cualquier otra situación en la cual esperar a la apelación constituiría un fracaso irremediable de la justicia.

La Regla 40 del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, delimita los criterios para la expedición de un auto de *certiorari.* Así pues, estas consideraciones "orientan la función del tribunal apelativo intermedio para ejercer sabiamente su facultad discrecional". *Rivera et al v. Arcos Dorados et al*, supra. La aludida regla permite que el análisis del foro apelativo intermedio no se efectúe en el vacío ni se aparte de otros parámetros al momento de considerar los asuntos planteados. *BPPR v. SLG Gómez-López*, 213 DPR 314, 337 (2023); *Rivera et al v. Arcos Dorados et al*, supra; *Torres González v. Zaragoza Meléndez*, 211 DPR 821, 848 (2023); *800 Ponce de León v. American International*, 205 DPR 163, 176 (2020). De conformidad con lo anterior, la Regla 40, *supra*, dispone los siguientes criterios:

A. Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

B. Si la situación de hechos planteada es la más indicada para el análisis del problema.

C. Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

D. Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

E. Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

F. Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

> **G.** Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia. 4 LPRA Ap. XXII-B.

Los foros revisores no debemos intervenir en las determinaciones de hechos del tribunal de instancia, "salvo que se pruebe que dicho foro actuó con prejuicio o parcialidad o incurrió en craso abuso de discreción o en error manifiesto." *Citibank v. ACBI*, 200 DPR 724, 736 (2018). Esta norma permite que el foro primario actúe conforme a su discreción judicial, que es la facultad que tiene "para resolver de una forma u otra, o de escoger entre varios cursos de acción". Id. pág. 735; *Graciani Rodríguez v. Garage Isla Verde*, LLC, 202 DPR 117, 132 (2019). El ejercicio esta discreción "está inexorable e indefectiblemente atado al concepto de la razonabilidad". Íd.; *Pueblo v. Hernández Villanueva*, 179 DPR 872, 890 (2010). Así pues, "la discreción es una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera". *Íd; Medina Nazario v. McNeil Healthcare LLC*, 194 DPR 723, 729 (2016). No obstante, un tribunal incurre en abuso de discreción cuando ignora sin fundamento un hecho material, concede demasiado peso a un hecho inmaterial, y fundamenta su determinación en ese hecho irrelevante, o cuando a pesar de examinar todos los hechos del caso hace un análisis liviano y la determinación resulta irrazonable. *íd*. pág. 736. En esos casos, los foros apelativos ostentamos la facultad discrecional para expedir el recurso de *certiorari* y ejercer nuestra función revisora.

**B.     Suspensión de los procedimientos del Tribunal de Primera Instancias ante la presentación de una apelación:**

Nuestro ordenamiento procesal civil rige las cuestiones atinentes a la suspensión de los procesos que se ventilan ante el Tribunal de Primera Instancia cuando se presenta un recurso de apelación. A esos fines, la Regla 52.3 lee en lo pertinente como sigue:

> Una vez presentado el escrito de apelación, se suspenderán todos los procedimientos en los tribunales inferiores respecto a la sentencia o parte de ésta de la cual se apela, o las cuestiones comprendidas en ella, salvo orden en contrario, expedida por iniciativa propia o a solicitud de parte por el tribunal de apelación; **pero el Tribunal de Primera Instancia podrá proseguir el pleito en cuanto a cualquier cuestión involucrada en el mismo no comprendida en la apelación**. Disponiéndose, que no se suspenderán los procedimientos en el Tribunal de Primera

> Instancia cuando la sentencia disponga la venta de bienes susceptibles de pérdida o deterioro, en cuyo caso el Tribunal de Primera Instancia podrá ordenar que dichos bienes sean vendidos y su importe depositado hasta tanto el tribunal de apelación dicte sentencia. (Énfasis suplido) 32 LPRA Ap. V, R. 52.3 (a).

De forma similar, la Regla 18 (A) del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, establece lo siguiente:

> Una vez presentado el escrito de apelación, se suspenderán todos los procedimientos en el Tribunal de Primera Instancia respecto a la sentencia, o parte de esta, de la cual se apela, o a las cuestiones comprendidas en esta, salvo orden en contrario expedida por iniciativa propia o a solicitud de parte por el Tribunal de Apelaciones, pero el Tribunal de Primera Instancia podrá proseguir el pleito en cuanto a cualquier cuestión no comprendida en la apelación.

En resumidas cuentas, la mera presentación de un recurso de apelación suspende de forma automática los procedimientos ante el tribunal de instancia, por lo que el referido tribunal pierde jurisdicción para atender cualquiera de **los asuntos sobre los cuales se está apelando**. (Énfasis suplido). *Mun. Rincón v. Velázquez Muñiz y otros*, 192 DPR 989, 1001-1002 (2015).

## C.    Costas del litigio:

En nuestro ordenamiento los gastos asociados al litigio se distinguen entre costas y honorarios. En cuanto a las costas la Regla 44.1 (a) de Procedimiento Civil, 32 LPRA Ap. V., dispone que se concederán a la parte a cuyo favor se resuelva el pleito, excepto en aquellos casos en que se disponga lo contrario por ley o por estas reglas. Las costas que concederá el tribunal son los gastos necesarios y razonables que tuvo que incurrir la parte prevaleciente del pleito en su tramitación. *PR Fast Ferries et al. v. AAPP,* 213 DPR 103, 116 (2023); *Rosario Domínguez et als. v. ELA et al.*, 198 DPR 197, 211 (2017). La Regla 44.1 (b) de Procedimiento Civil, 32 LPRA Ap. V., dispone que la parte que reclame el pago de costas presentará al tribunal y notificará a la parte contraria, dentro del término de 10 días a partir del archivo en autos de copia de la notificación de la sentencia, un memorándum, rendido bajo juramento o certificación del abogado, de todas las partidas de gastos y desembolsos necesarios en que se incurrió durante la tramitación del pleito. *Class Fernández v. Metro Health Care Management System, Inc.*, 2024 TSPR 63.

Esta concesión supone una función reparadora bajo la premisa de que el derecho de la parte victoriosa no debe quedar menguado por los gastos que tuvo que incurrir sin su culpa o por culpa del adversario. *J.T.P. Dev. Corp. v. Majestic Realty Corp.,* 130 DPR 456, 460 (1992). El Tribunal goza de amplia discreción para determinar cuáles son los gastos necesarios que el litigante perdidoso debe pagar como costas. *Auto Servi, Inc. v. E.L.A.*, 142 DPR 321, 326 (1997).

En lo relativo a las costas incurridas por labor pericial, su concesión no se da de forma automática, por lo cual el tribunal debe pasar juicio sobre su procedencia. *Maderas Tratadas v. Sun Alliance et al.*, 185 DPR 880, 935-936 (2012). En ese ejercicio, el tribunal deberá evaluar la naturaleza del testimonio pericial y su utilidad a la luz de los hechos particulares de cada caso*. Id.* En ese sentido, se tomarán en cuenta las credenciales de los peritos; y el alcance de sus testimonios a los efectos de auscultar su utilidad en beneficio de la postura procesal de la parte que resulte victoriosa. *Id.* De otra parte, los testimonios periciales serán descartados en la medida en que resulten irrelevantes, inmateriales o innecesarios en la tramitación del caso para el cual se solicita rembolso. *Id.*

**III.**

En el ejercicio de revisar los méritos de los casos consolidados, comenzaremos por evaluar los señalamientos de error del caso **KLAN202500093**.

Como primer señalamiento de error, los apelantes-peticionarios alegan que el tribunal de instancia incidió al valorar los daños físicos y emocionales de la apelada-recurrida en la cantidad de $523,972.60. Entienden que la referida cantidad es una cuantía exagerada y que el tribunal de instancia incidió al fundamentar el cómputo de los daños en un solo caso del foro apelativo que no detalla la extensión de dichos daños. Además, es de la apreciación de los apelantes-peticionarios que la

valoración de los daños físicos y emocionales de la apelada-recurrida debe cuantificarse entre las cantidades de $59,000.00 y $125,000.00.

Por su parte, la apelada-recurrida sostiene que la cuantía concedida en daños por el tribunal de instancia no es exageradamente alta. Entiende que la referida cantidad está fundamentada en las conclusiones de derecho y determinaciones de hechos adoptadas por dicho tribunal.

Según expuesto en el precitado marco doctrinal, el ejercicio de valorar los daños es una tarea difícil que conlleva calcular una cuantía económica que se ajuste a los perjuicios sufridos por una persona. En dicha labor, los foros apelativos solo hemos de intervenir cuando la estimación de daños del foro primario sea exageradamente alta o ridículamente baja. En esta ocasión, coincidimos con los apelantes-peticionarios que la cuantía concedida a la apelada-recurrida es una exageradamente alta que amerita reducirse a un valor mas justo. Sin embargo, no nos persuade que la valoración de daños deba ajustarse a una cuantía económica entre las cantidades de $59,000.00 y $125,000.00. Los hechos y las circunstancias particulares del presente caso, así como el sentido de la justicia ameritan un ajuste distinto.

Para valorar los daños del presente caso resaltan como casos similares a este: *Quiñones López v. Manzano Pozas*, 141 DPR 139 (1996) y *Rivera Otero v. Elines Const., S.E.*, KLAN201800756, KLAN201800778 y KLCE201801170 del 2019.

En Rivera Otero v. Elines Const., S.E., *supra*, de forma similar al caso de epígrafe, los hechos que motivaron la reclamación se fundamentaron en un accidente vehicular. En dicho caso, el señor Rivera fue impactado de forma directa por un camión. A consecuencia de ello, instó una causa de acción por daños físicos y angustias mentales. Surge de las determinaciones de hecho expuestas por el foro primario, que las pruebas médicas realizadas al señor Rivera revelaron los diagnósticos de disco herniado central L-5 S-1; disco pequeño a moderado disco herniado L-4, L-5; una inflamación a nivel de L-3 L-4; y poli-radiculopatía. Por sus

daños se le otorgó un doce porciento (12%) de impedimento en la región lumbosacral. Como parte de su tratamiento médico, el señor Rivera recibió un total de veintiún (21) terapias físicas. Finalmente, se le otorgó un veintidós (22%) de impedimento permanente y limitaciones futuras por lo cual se le indemnizó con la suma de **$170,823.52**. El foro apelativo mantuvo inalterada dicha suma, la cual refleja una indemnización de **$7,764.70** por cada porciento de impedimento.

Además, en dicho caso, el foro apelativo mantuvo la partida concedida por el foro primario por los diagnósticos de radiculopatía, discos herniados a nivel cervical y lumbar. Solo que la modificó en la cantidad de **$30,714.29**. Es preciso señalar, que el señor Rivera sufrió otra serie de daños físicos por los que fue indemnizado económicamente, los cuales omitimos detallar por no guardar relevancia con el caso ante nuestra consideración.

De otra parte, utilizamos como referencia el caso Quiñones *López v. Manzano Pozas*, *supra,* por su pertinencia en términos de las intervenciones quirúrgicas efectuadas. En el precitado caso, el señor Quiñones fue arrollado por un automóvil. Como consecuencia del accidente, se determinó que el señor Quiñones sufrió una "fractura conminuta desplazada subtrocantérica del fémur, debajo del lado izquierdo de la pierna." Debido a ello, se le practicó **una intervención quirúrgica del subtrocante** en la que se le colocó una **placa metal**, la cual se fijó con un total de nueve **(9) tornillos**. Tras la operación estuvo en reposo seis (6) meses; recibió ciento cincuenta y seis (156) terapias; y permaneció en silla de ruedas alrededor de cinco (5) meses. Posteriormente, en una **segunda operación** se le removieron los tornillos, se le instaló un "Zickel Nail" y se le practicó un injerto de hueso. A su vez, se determinó que los sucesos acontecidos habían afectado su vida familiar y profesional. Ante ello, el foro primario dictó sentencia en el año 1991, mediante la cual le indemnizó por la cantidad de **$151,000.00,** suma que el Tribunal Supremo mantuvo inalterada.

Según establecido en *Rodríguez et al. v. Hospital et al.*, supra, pág. 910-923 (2012) y reiterado en *Santiago Montañez v. Fresenius Medical*, supra, pág. 497-498, tras examinar las cuantías concedidas en casos similares, las referidas cantidades se deben ajustar al valor presente. Para el logro de esto, como primer paso se debe calcular el valor adquisitivo del dólar para el año en que se emitió el dictamen del caso similar. Para ello, se divide 100 entre el Índice de Precios al Consumidor (IPC) de dicho año. Luego se multiplica la indemnización concedida en el caso similar por el valor adquisitivo del dólar en el año en que se dictó la sentencia de dicho caso. En el siguiente paso, el resultado obtenido en el paso anterior se divide entre el valor adquisitivo del dólar para el año en que se dictó la sentencia del caso que se valora en la actualidad. Veamos.

En *Rivera Otero v. Elines Const., S.E., supra,* se le concedió al agraviado la cantidad de **$7,764.70** por cada porciento de **impedimento permanente y limitaciones futuras sufridas**. En dicho caso, la sentencia del tribunal de instancia fue dictada en el 2018. En el caso de epígrafe, la apelada-recurrida fue diagnosticada con un diecisiete porciento (17%) de impedimento físico permanente. Al multiplicar la cantidad de **$7,764.70** por el referido porcentaje de impedimento, se obtiene como resultado la cantidad de **$131,999.90**. Ahora corresponde ajustar dicha cuantía al valor presente. Para el 2018 el IPC era de 119.113. Al dividir 100 entre 119.133 obtenemos el valor adquisitivo del dólar para esa fecha que es de $0.84.[9] Como próximo paso, se multiplica $131,999.90 por $0.84, lo que resulta en $110,879.92. Finalmente, dicho resultado se divide entre el poder adquisitivo del dólar a la fecha de la actual sentencia. Para el año 2025 el valor adquisitivo del dólar es de $0.73. Siendo así: $110,879.92 ÷ $0.73 = **$151,890.30**.

Ahora corresponde repetir la precitada formular para la indemnización concedida por **radiculopatía, discos herniados a nivel cervical y lumbar** en el caso *Rivera Otero v. Elines Const., S.E., supra.*

---

[9] Véase, la tabla de Índice de Precios al Consumidor (IPC) en la página electrónica de estadísticas.pr y la tabla de "Poder Adquisitivo del Dólar del Consumidor para Todas las Familias en Puerto Rico" de la página electrónica www.mercadolaboral.pr.gov.

Siendo así, se multiplica la suma de **$30,714.29** por $0.84, lo que resulta en un total de $25,800.00. Al dividir $25,800.00 entre $0.73 se obtiene la cantidad de **$35,342.47**.

Por su parte, en el caso Quiñones *López v. Manzano Pozas, supra* se indemnizó al agraviado con la cantidad de **$151,000.00**. En ese caso la sentencia fue dictaminada en el año 1991. Para ese año el valor adquisitivo del dólar era de $1.37. Cantidad resultante de la división de 100 entre 72.845 de IPC, para esa fecha.[10] Así pues, $151,000.00 (x) $1.37 = 206,870.00. Al dividir dicho resultado entre $0.73 se obtiene como resultado final la cantidad de **$283,383.56**.

Al sumar las diferentes partidas: **$151,890.30** (impedimento) + **$35,342.47** (radiculopatía, discos herniados a nivel cervical y lumbar) y **$283,383.56** (intervención quirúrgica y otros daños), el resultado total es de **$470,616.33**. Ahora bien, es conocido que no existen casos exactamente iguales. Los casos utilizados como referencia tienen especial relevancia con el presente caso en el desglose de las partidas atinentes a los discos herniados, impedimento e intervención quirúrgica. No obstante, se debe ajustar la cantidad de **$470,616.33** a las circunstancias particulares del caso ante nuestra consideración.

Surge de la prueba testimonial y pericial resumida anteriormente, que la apelada-recurrida tuvo una sola intervención quirúrgica en la que le colocaron seis (6) tornillos, dos (2) varillas y dos (2) spacers. Al contrario de lo que sucedió en el caso del señor Rivera Otero, la apelada-recurrida no tuvo impedimento cervical. Tampoco estuvo sometida a ciento cincuenta y seis (156) terapias físicas como pasó en el caso del señor Quiñones. Tampoco estuvo en reposo durante seis (6) meses ni en silla de ruedas por espacio de cinco (5) meses como le ocurrió al referido señor Quiñones López. Sí, estuvo hospitalizada por un periodo de tres (3) días y recibió un total de treinta y cuatro (34) terapias físicas. Le practicaron bloqueos lumbares; le encontraron hallazgos de radiculopatía bilateral, la cual

---

[10] Véase, la tabla de Índice de Precios al Consumidor (IPC) en la página electrónica de estadísticas.pr

permanece de **forma residual**; y su operación fue de dos niveles: L4 a L5 a S1 con fusión bilateral.  Su diagnóstico fue de "Lumbar herniated disks" y sufrió angustias mentales. Además, la prueba pericial coincide en que tiene un diecisiete por ciento (17%) de impedimento físico permanente. Ante tales distinciones y circunstancias particulares, valoramos los daños de la apelada-recurrida en la cantidad total de **$400,000.00**.

Por estar relacionados entre sí, se discutirán el segundo, tercero y cuarto señalamiento de error de manera conjunta. En los referidos señalamientos de error, los apelantes-peticionarios cuestionan la procedencia de la indemnización de lucro cesante y la credibilidad del Dr. Javier Espina, perito en terapia física, presentado por la apelada-recurrida para opinar sobre su capacidad funcional. En síntesis, los apelantes-peticionarios sostienen que es improcedente la indemnización por lucro cesante, dado que el Dr. Javier Espina no pudo establecer que la apelada-recurrida se encuentre en la actualidad incapacitada para trabajar en la economía nacional. De igual modo, alegan que es increíble el testimonio del Dr. Javier Espina, puesto que la apelada-recurrida pudo trabajar luego del accidente y realiza actividades en su diario vivir que son incompatibles con su aducida incapacidad. Asimismo, argumentan que los exámenes del Dr. Javier Espina carecen de confiabilidad por ser subjetivos y por tener resultados contrarios a las conclusiones de los estudios realizados por el Dr. Cortés Santos, también perito presentado por la apelada-recurrida.

Por su parte, la apelada-recurrida aduce que las cualificaciones del Dr. Javier Espina no fueron objetadas por los apelantes peticionarios. De igual modo, arguye que el tribunal de instancia le brindó credibilidad al testimonio del Dr. Javier Espina. A su vez, asevera que los apelantes-peticionarios no presentaron prueba pericial sobre la capacidad funcional de la apelada-recurrida. A la luz de lo anterior, sostiene que la prueba presentada por los apelantes-peticionarios no demuestra que exista una conclusión que sea más certera que lo testificado por el Dr. Javier Espina. De otra parte, argumenta que el Dr. Javier Espina y el Dr. Cortés Santos

son especialistas distintos que testificaron sobre materias diferentes, por lo cual es improcedente compararlos para cuestiones de impugnación pericial.

De un examen minucioso de la totalidad del expediente y de la Transcripción del *Juicio en su Fondo*, concluimos que los errores segundo, tercero y cuarto no fueron cometidos.

Es preciso señalar de entrada, que en el caso de epígrafe los apelantes-peticionarios admitieron que incurrieron en negligencia. De igual modo, las partes coincidieron en que la apelada-recurrida sufrió daños físicos. Tanto así, que la prueba pericial presentada por ambas partes concluyó que la apelada-recurrida tiene un diecisiete por ciento (17%) de impedimento físico permanente. De modo que, la única cuestión que quedó por dilucidar se circunscribe a los daños que se han de valorar y las cuantías que a esos efectos se deben adjudicar.

En el presente caso, ambas partes presentaron prueba pericial para calcular la cuantía a conceder a la apelada-recurrida en concepto de lucro cesante. De hecho, la cuantía que se concedió por lucro cesante fue la segunda recomendación propuesta por el Doctor en economía, Javier Del Valle, presentado por los propios apelantes-peticionarios. También es meritorio resaltar, que los apelantes-peticionarios no presentaron prueba pericial que refutara el análisis de capacidad funcional efectuado por el Dr. Javier Espina.

Si bien es cierto que existen ciertas discrepancias en los resultados de las evaluaciones físicas efectuadas por el Dr. Cortés Santos y el Dr. Javier Espina, no se debe omitir que ambos son especialistas distintos que examinaron cuestiones diferentes de la apelada-recurrida. El Dr. Cortés Santos es un médico fisiatra mientras que el Dr. Javier Espina es un terapista físico. Asimismo, el Dr. Cortés Santos se encargó de determinar el impedimento de la apelada-recurrida mientras que el Dr. Javier Espina se encargó de evaluar la capacidad funcional de ésta. Además, sus apreciaciones no demuestran una incompatibilidad que trascienda a la

esencialidad del caso y con ello trastoque el impedimento otorgado a la apelada-recurrida o la conclusión de su capacidad funcional. Prueba de ello, es que el Dr. Javier Espina utilizó para su evaluación los récords médicos de la apelada-recurrida que reflejan una limitación significativa en la espalda baja. A su vez, ambos doctores coinciden en que la apelada-recurrida puede realizar ciertas actividades básicas del diario vivir de forma independiente y en otras necesita cierta asistencia, como lo sería al ponerse y quitarse los zapatos.[11]

De otra parte, los apelantes-peticionarios cuestionan la falta de capacidad de la apelada-recurrida para trabajar en la economía nacional y aducen que realiza actividades incompatibles con su impedimento físico. El testimonio pericial del Dr. Suárez Castro, presentado por los apelantes-peticionarios, concluyó que la apelada-recurrida tiene limitaciones en el área lumbar y que debido a su operación puede tener dolor y limitaciones de movimiento.[12] Por su parte, el Dr. Cortés Santos, cuya credibilidad no es impugnada por los apelantes-peticionarios, opinó que la apelada-recurrida tiene un impedimento total permanente **el cual no va a cambiar en el futuro.[13]**

Las referidas apreciaciones periciales no distan de las expresiones también periciales del Dr. Javier Espina, por medio de las cuales concluyó que la apelada-recurrida no puede trabajar en la economía nacional a tiempo completo o parcial de forma razonable y continua.[14] Las referidas opiniones, también fundamentan el hecho de que los daños de la apelada-recurrida no son pasajeros y se proyectan a futuro. Por consiguiente, no nos persuaden las alegaciones sobre la capacidad funcional de la apelada-recurrida, según levantadas por los apelantes-peticionarios. Además, ante la ausencia de error manifiesto, prejuicio, parcialidad o pasión, concedemos deferencia a la apreciación de la prueba adjudicada por el

---

[11] Véase la Transcripción del *Juicio en su Fondo*, págs. 199; 524; y 527.
[12] Véase la Transcripción del *Juicio en su Fondo*, págs. 597 y 605.
[13] Véase Transcripción del *Juicio en su Fondo*, pág. 185.
[14] Véase la Transcripción del *Juicio en su Fondo*, págs. 564-565.

foro sentenciador. Véase, *Santiago Ortiz v. Real Legacy et al.*, supra, pág. 219.

En lo que respecta a los planteamientos de los apelantes-peticionarios en torno a la credibilidad pericial del Dr. Javier Espina y la confiabilidad de sus evaluaciones, es conocido que los foros apelativos nos encontramos en la misma posición que el foro primario para examinar la prueba pericial. Al revisar el testimonio del Dr. Javier Espina, concluimos que no concurren los fundamentos necesarios para descartar su testimonio pericial. El Dr. Javier Espina posee un doctorado en terapia física.[15] Fue el único perito capacitado en el área de capacidad funcional que determinó como se manifiestan a nivel funcional los diagnósticos de la apelada-recurrida para llevar a cabo tareas ocupacionales y del diario vivir.[16] Utilizó cuestionarios que son **estandarizados**; **pruebas objetivas** como las que se basan en la provocación de dolor; examinó los estudios que obran en el **récord médico de la demandante**, los cuales reflejan una limitación significativa de la espalda baja; y utilizó **pruebas estandarizadas** como la denominada "Time Up and Go Test."[17] Por lo tanto, no incidió el tribunal de instancia en su apreciación pericial.

Como último señalamiento de error, los apelantes-peticionarios aseveran que incidió el tribunal de instancia al imponerles honorarios de abogado por temeridad. Aducen que dicha imposición no se sostiene, puesto que admitieron el haber incurrido en negligencia, lo cual logró que la apelada-recurrida no tuviera que efectuar gastos periciales para reconstruir el accidente y probar dicha negligencia. Añaden, que cooperaron en estipular hechos y prueba documental. A su vez, alegan que el caso es uno complejo, toda vez que existe controversia sobre la capacidad de la apelada-recurrida para trabajar y se requiere un análisis de la valorización de los daños a compensar.

Por su parte, la apedada-recurrida arguye que los apelantes-peticionarios inicialmente negaron en la alegación responsiva el haber

---

[15] Véase, la Transcripción del *Juicio en su Fondo*, pág. 483.
[16] Véase, la Transcripción del *Juicio en su Fondo*, pág. 491.
[17] Véase la Transcripción del *Juicio en su Fondo*, págs. 492; 525-527; y 531-532.

incurrido en negligencia. A raíz de ello, sostiene que el 11 de enero de 2023, tuvo que presentar una moción de sentencia sumaria parcial sobre la cuestión de la negligencia. A la cual, los apelantes-peticionarios se opusieron. A su vez, aduce que los apelantes-peticionarios provocaron dilaciones procesales al solicitar infructuosamente la extensión del descubrimiento de prueba. Al amparo de los fundamentos que anteceden, peticionó que se mantenga inalterada la imposición de honorarios de abogado por temeridad.

La imposición de temeridad descansa en la sana discreción del tribunal de instancia. Al examinar los presentes hechos, no se desprende que el foro primario haya incurrido en abuso de discreción. En efecto, los apelantes-peticionarios admitieron que incurrieron en negligencia. Sin embargo, dicha admisión se dio en una etapa avanzada de los procesos. Antes de la referida admisión, negaron el haber incurrido en negligencia a través de las alegaciones responsivas que presentaron. No fue hasta la presentación de la "*Moción en Cumplimiento de Orden*" del 1 de marzo de 2023, que los apelantes-peticionarios aceptaron la negligencia. Entiéndase, aproximadamente un año y cinco meses de haberse presentado la "*Demanda*" de epígrafe. Dicho accionar es ejemplo de dilaciones procesales innecesarias y de trabajo y gastos adicionales para la otra parte litigante.

Además, como bien señala el tribunal de instancia, nuestro mas Alto Foro ha validado la imposición de temeridad en casos en que se acepta negligencia luego de haberla negado en la contestación a demanda. Véase, *Rodríguez Cancel v. A.E.E.*, 116 DPR 443, 460-461 (1985). En vista de ello, el quinto error no fue cometido.

A la luz de lo expuesto, concluimos que la "*Sentencia*" apelada debe modificarse únicamente a los efectos de reducir la cuantía concedida en concepto de daños físicos, impedimento y angustias mentales a la cantidad resultante de **$400,000.00.** En consecuencia, confirmamos en todos sus extremos el resto de la referida "*Sentencia.*"

Así pues, en estos momentos pasamos a revisar el recurso **KLCE202500315**.

En esencia, los apelantes-peticionarios sostienen que el tribunal de instancia incidió al adjudicar el "*Memorándum de Costas*," presentado por la apelada-recurrida. Aseveran, que a la fecha de efectuarse dicha adjudicación el referido tribunal carecía de jurisdicción para atender el aludido asunto por estar pendiente ante el foro apelativo el recurso de apelación **KLAN202500093**. En cuanto a los méritos del "*Memorándum de Costas*," argumentan que es improcedente conceder todas las cuantías peticionadas, dado que algunas carecen de justificación. En particular, sostienen que la apelada-recurrida reclama gastos periciales y de deposiciones que son irrazonables.

En oposición, la apelada-recurrida aduce que la Regla 52.3 de Procedimiento Civil, *supra,* permite que tribunal de instancia pueda continuar dilucidando cualquier cuestión no comprendida en un recurso de apelación luego de que este haya sido presentado. Ante ello, asevera que el tribunal de instancia tenía autoridad para emitir una determinación sobre las costas del litigio, dado que estas no forman parte de los señalamientos del recurso de apelación **KLAN202500093.** En lo que respecta a los méritos de las costas peticionadas, arguye que la determinación de solicitar la justificación de estas recae en la sana discreción del tribunal de instancia luego de que concluya que las partidas se han impugnado válidamente.

Tras examinar la totalidad del expediente, concluimos en *expedir* el auto de *certiorari* **KLCE202500315** y con ello *confirma*r la "*Orden*" recurrida.

Surge de los hechos que anteceden, que el 16 de enero de 2025, la apelada-recurrida presentó el "*Memorándum de Costas*" objeto de revisión. Asimismo, con anterioridad a la presentación del recurso apelativo **KLAN202500093**, los apelantes-peticionarios presentaron "*Oposición a Memorando de Costas*." Antes de adjudicar finalmente el "*Memorándum de Costas*," el 3 de febrero de 2025, el tribunal de instancia les concedió a los

apelantes-peticionarios un término de diez (10) días para que se expresaran sobre la "*Réplica a Oposición a Memorando de Costas y Solicitud de Reconsideración en cuanto a mantener en suspenso la determinación de costas*," presentada por la apelada-recurrida. No obstante, antes de vencer el término concedido, el 6 de febrero de 2025, los apelantes-peticionarios presentaron la apelación de designación alfanumérica **KLAN202500093.**

Conforme fue esbozado, la Regla 52.3 de Procedimientos Civil, *supra*, dispone que una vez presentado un recurso de apelación los procesos ante el tribunal de instancia se suspenderán. No obstante, la precitada regla no establece una suspensión total de los procesos, dado que el tribunal de instancia puede proseguir el pleito en cuanto a cualquier cuestión que no esté comprendida en la apelación.

Ante tales hechos y el marco doctrinal aplicable, corresponde revisar las cuestiones planteadas en el recurso de apelación del caso **KLAN202500093** para determinar si el tribunal de instancia tenía jurisdicción para adjudicar el "*Memorándum de Costas.*" Así pues, al examinar el "*Escrito de Apelación*" y el "*Alegato Suplementario de la Parte Apelante*," presentados por los apelantes-peticionarios, no se desprende entre sus señalamientos de error alguna alegación en torno a las costas del litigio. Siendo así, el tribunal de instancia tenía autoridad para adjudicar el "*Memorándum de Costas.*"

Superado el análisis jurisdiccional, pasamos a evaluar la procedencia de las cuantías concedidas en concepto de costas, particularmente las partidas periciales y de deposiciones que impugnan los apelantes-peticionarios.

Nuestro ordenamiento procesal civil permite que las costas del litigio se satisfagan a favor del litigante victorioso. Las partidas a satisfacer en concepto de costas son aquellas catalogadas como necesarias y razonables para la tramitación del pleito. Para llevara a cabo el referido ejercicio de necesidad y razonabilidad el tribunal de instancia goza de

amplia discreción. En el presente caso, los apelantes peticionarios argumentan que la apelada-recurrida no justificó algunos gastos periciales y de deposición. De una lectura cuidadosa de los expedientes ante nuestra consideración y de la Transcripción del *Juicio en su Fondo*, determinamos que los testimonios periciales y las deposiciones fueron de utilidad para adelantar la postura procesal de la apelada-recurrida. Éstos fueron esenciales para establecer y estimar los daños físicos y económicos que alegaba la referida parte.

Por consiguiente, no estamos ante un escenario en que los testimonios periciales o sus deposiciones fueran inmateriales o innecesarias. En vista de ello, no incidió el tribunal de instancia al declarar *Ha Lugar* "*Memorándum de Costas*," y con ello ordenar a los apelantes-peticionarios pagar la cantidad de $15,157.34 en concepto de costas.

**IV.**

Por los fundamentos que anteceden, modificamos la "*Sentencia*" dictaminada en el caso **KLAN202500093** a los *únicos efectos* de reducir la cuantía concedida en concepto de daños físicos, impedimento y angustias mentales a la cantidad resultante de **$400,000.00.** *Confirmamos* en todos sus extremos el resto de la referida "*Sentencia.*" De otra parte, determinamos al amparo de la Regla 40, *supra,* expedir el recurso de *certiorari* **KLCE202500315** y con ello *confirmamos* la "*Orden*" recurrida.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones